1
2
3
4
5
6
7
8
9
10
11
12

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

13

**NORTHWEST ENVIRONMENTAL
ADVOCATES,** an Oregon non-profit
corporation,

14

Case No. 19-1537

15

Plaintiff,

**COMPLAINT**

16

v.

Pursuant to the Administrative
Procedure Act and Clean Water Act

17
18
19
20
21

**UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY**; **ANDREW
WHEELER,** in his official capacity as
Administrator of the Environmental
Protection Agency; **CHRIS HLADICK,** in
his official capacity as Regional
Administrator Environmental Protection
Agency Region 10,

22

Defendants.

23

**NATURE OF THE CASE**

24

1.      Through this action, plaintiff Northwest Environmental Advocates ("NWEA")

25

challenges the failure of the defendants United States Environmental Protection Agency ("EPA"),

26

EPA Administrator Andrew Wheeler, and EPA Regional Administrator Chris Hladick, to ensure

COMPLAINT                          1      Western Environmental Law Center      Earthrise Law Center
                                          1402 3rd Ave, Suite 1022              Lewis & Clark Law School
                                          Seattle, WA 98101                     10015 SW Terwilliger Blvd.
                                          206-487-7250                          Portland, OR 97219
                                                                                503-768-6929

1  the protection and restoration of fresh and marine waters of the State of Washington in violation
2  of the mandates of the Clean Water Act ("CWA" or "Act"), 33 U.S.C. § 1251 *et seq.*, and EPA's
3  implementing regulations.

4          2.      The CWA and federal regulations require each state every two years to review the
5  status of all its waters to determine which waterbodies, if any, are falling short of established
6  goals that ensure those waterbodies are clean enough to support human and ecological uses, such
7  as drinking, swimming, fishing, and wildlife.  The state must identify all such "impaired" waters,
8  and submit that list, along with a priority ranking for developing pollution clean-up plans called
9  "Total Maximum Daily Loads" ("TMDLs") that the state is required to develop for each impaired
10  waterbody, to EPA for approval.  This priority ranking must include a schedule for those waters
11  targeted for TMDLs in the coming two-year period.

12          3.      EPA, in turn, must review the state's submission of its list of impaired waters and
13  the state's priorities and determine whether the state has complied with the law.  Where the state
14  has fallen short, the CWA requires EPA to step in and establish a proper, timely, lawful list of
15  impaired waters, and if necessary develop the TMDL clean-up plans for those waterbodies.  Here,
16  EPA has neglected to fulfill its duties.

17          4.      On December 21, 2012, EPA approved Washington's 2010 list of impaired
18  waters, which only updated the status of marine waters.  This was the last time Washington
19  reviewed and updated its list of impaired marine waters.  EPA has taken no action since
20  December 21, 2012 to identify impaired marine waters in Washington.

21          5.      On July 22, 2016, EPA approved Washington's 2012 list of impaired waters,
22  which only updated the status of fresh waters.  This was the last time Washington reviewed and
23  updated its list of impaired fresh waters.  EPA has taken no action since July 22, 2016 to identify
24  impaired fresh waters in Washington.

25          6.      In addition, neither the Washington Department of Ecology ("Ecology") nor EPA
26  has developed TMDLs in a timely fashion—indeed, Ecology has completed only one TMDL in

COMPLAINT                                    2      Western Environmental Law Center        Earthrise Law Center
                                                    1402 3rd Ave, Suite 1022                Lewis & Clark Law School
                                                    Seattle, WA 98101                       10015 SW Terwilliger Blvd.
                                                    206-487-7250                            Portland, OR 97219
                                                                                            503-768-6929

the past three fiscal years.  At the same time, the list of impaired waters in Washington requiring TMDLs continues to grow rapidly.  The combination of a list of impaired waters needing TMDLs that is both inadequate and growing, and the corresponding lack of TMDLs, has resulted in a near collapse of the water pollution regulatory scheme in Washington.  Without the proper identification of waters as impaired, and the assignment of loads to be achieved in TMDLs, Ecology and EPA permit writers consistently fail to write Clean Water Act permits that properly limit the discharge of pollutants to meet state water quality standards.

7.     This serious deficiency in the state's water pollution regulatory scheme fails to protect the already critically-imperiled fish and wildlife species, such as Chinook salmon and the Southern Resident killer whale, which both depend upon the quality of Washington waters and that have been listed as threatened and endangered under the Endangered Species Act.

8.     Because of these long-standing failures, NWEA alleges that EPA's 2016 approval of Washington's 2012 list of impaired waters was arbitrary, capricious, and not in accordance with the law under CWA section 303(d) and EPA's implementing regulations, 40 C.F.R. § 130.7. Specifically, EPA should have disapproved Ecology's list of impaired waters, and developed an adequate list, because Ecology failed to assemble and evaluate all the existing and readily available water quality-related data and information and failed to fully and properly apply the state's water quality standards in developing the 2012 list.  Moreover, EPA has repeatedly violated its duty to act in the face of a recalcitrant state by refusing to develop its own, complete list of impaired fresh and marine waters in 2012, 2014, 2016, and 2018.

9.     Further, EPA has impermissibly approved Washington's glacial rate of developing TMDL clean-up plans for thousands of the State's polluted surface waters. As this Court has recognized, "[t]he role of TMDLs in the CWA strategy for improving water quality confirms that they were to be developed quickly." *Idaho Sportsman's Coal. v. Browner*, 951 F. Supp. 962, 967 (W.D. Wash. 1996). *See also Alaska Ctr. for the Env't v. Reilly*, 796 F. Supp. 1374, 1379 (W.D. Wash. 1992), *aff'd sub nom. Alaska Ctr. for Env't v. Browner*, 20 F.3d 981 (9th

Western Environmental Law Center
1402 3rd Ave, Suite 1022
Seattle, WA 98101
206-487-7250

Earthrise Law Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR 97219
503-768-6929

1  Cir. 1994) (noting that "the intent of Congress clearly requires the Agency to act without undue
2  delay" in developing TMDLs).

3  **JURISDICTION AND VENUE**

4  10.     This action arises under the Clean Water Act, 33 U.S.C. § 1365(a)(2), and the
5  Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706.

6  11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal
7  question) and 33 U.S.C. § 1365(a) (CWA citizen suit jurisdiction). The requested relief is proper
8  under 28 U.S.C. § 2201(a), 28 U.S.C. § 2202, 33 U.S.C. § 1365(a), and 5 U.S.C. §§ 705, 706.

9  12.     On June 14, 2019, NWEA sent EPA the required Notice of Intent to Sue, pursuant
10  to 33 U.S.C. § 1365(b)(1)(A).

11  13.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because a
12  substantial part of the events or omissions giving rise to the claims occurred in Seattle,
13  Washington, where EPA's Region 10 administrative office is located.

14  **PARTIES**

15  14.     The plaintiff in this action is NORTHWEST ENVIRONMENTAL
16  ADVOCATES.  Established in 1969, NWEA is a regional non-profit environmental organization
17  incorporated under the laws of Oregon in 1981 and organized under section 501(c)(3) of the
18  Internal Revenue Code.  NWEA's principal place of business is in Portland, Oregon.  NWEA's
19  mission is to work through advocacy and education to protect and restore water and air quality,
20  wetlands, and wildlife habitat in the Northwest and the nation, including Washington.  NWEA
21  employs advocacy with administrative agencies, community organizing, strategic partnerships,
22  public record requests, information sharing, expert analysis, lobbying, education, and litigation to
23  ensure better implementation of the laws that protect and restore the natural environment.  NWEA
24  has participated in the development of CWA programs in the State of Washington for many years,
25  including the state's TMDL program by, *inter alia*, having brought suit in 1991 against EPA for
26

COMPLAINT     4     Western Environmental Law Center     Earthrise Law Center
1402 3rd Ave, Suite 1022     Lewis & Clark Law School
Seattle, WA 98101     10015 SW Terwilliger Blvd.
206-487-7250     Portland, OR 97219
503-768-6929

1   its failure to establish TMDLs for the State of Washington and serving on EPA's TMDL federal

2   advisory committee from 1996 to 1998.

3         15.    NWEA's members regularly use and enjoy the waters of the State of Washington,

4   including waters that are currently impaired by pollution.  NWEA's members regularly use and

5   enjoy these waters and adjacent lands and have definite future plans to continue using them for

6   recreational, subsistence, scientific, aesthetic, spiritual, commercial, conservation, educational,

7   employment, and other purposes.  Many of these interests revolve around viewing sensitive

8   salmonid species and other aquatic species that are under threat by pollution in the covered

9   waters.

10         16.    The recreational, aesthetic, conservation, employment, scientific, and other

11   interests of NWEA and its members have been, are being, and unless relief is granted, will

12   continue to be adversely affected and irreparably injured by EPA's failure to comply with the

13   CWA.

14         17.    Defendant U.S. ENVIRONMENTAL PROTECTION AGENCY is the federal

15   agency charged with the administration of the CWA, and specifically with approving or

16   disapproving state identification of impaired waters and state TMDL submissions under section

17   303(d)(2) of the CWA, 33 U.S.C. § 1313(d)(2).

18         18.    Defendant ANDREW WHEELER is sued in his official capacity as the

19   Administrator of the EPA.  In that role, he is charged with the duty to uphold the CWA and its

20   implementing regulations and to take required regulatory actions according to the schedules

21   established therein.

22         19.    Defendant CHRIS HLADICK is sued in his official capacity as the Regional

23   Administrator of Region 10 of the EPA.  In that role, he is charged with the duty to uphold the

24   CWA and its implementing regulations and to take required regulatory actions according to the

25   schedules established therein.

26

COMPLAINT        5      Western Environmental Law Center    Earthrise Law Center
1402 3rd Ave, Suite 1022    Lewis & Clark Law School
Seattle, WA 98101    10015 SW Terwilliger Blvd.
206-487-7250    Portland, OR 97219
503-768-6929

1
## LEGAL BACKGROUND

2
**The Clean Water Act and Water Quality Standards that Establish the Need and Basis for**
3
**Water Quality-Based Pollution Controls**

4
20.     Congress adopted amendments to the CWA in 1972 in an effort "to restore and
5
maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. §
6
1251(a).  While the primary goal of the CWA is to eliminate the discharge of pollutants into
7
navigable waters entirely, Congress established "an interim goal of water quality which provides
8
for the protection and propagation of fish, shellfish, and wildlife." *Id.* § 1251(a)(1)–(2).

9
21.     To meet these statutory goals, the CWA requires states to develop water quality
10
standards that establish, and then protect, the desired conditions of each waterway within the
11
state's regulatory jurisdiction.  33 U.S.C. § 1313(a).  Water quality standards must be sufficient to
12
"protect the public health or welfare, enhance the quality of water, and serve the purposes of [the
13
CWA]." *Id.* § 1313(c)(2)(a).  Water quality standards establish the water quality goals for a
14
waterbody.  40 C.F.R. §§ 131.2, 131.10(d).  EPA is charged with approving or disapproving a
15
state's water quality standards and, in some instances, establishing standards for a state.  *See* 33
16
U.S.C. § 1313 (c)(2)(a), (3).

17
22.     Water quality standards must include three elements: (1) one or more designated
18
beneficial uses of a waterway; (2) numeric and narrative criteria specifying the water quality
19
conditions, such as maximum amounts of toxic pollutants, maximum temperature levels, and the
20
like, that are necessary to protect the designated uses; and (3) an antidegradation policy that
21
ensures that beneficial uses dating to 1975 are protected and high quality waters will be
22
maintained and protected. 33 U.S.C. §§ 1313(c)(2), (d)(4)(B); 40 C.F.R. Part 131, Subpart B.

23
23.     Among other things, water quality standards serve as the regulatory basis for
24
establishing water quality-based controls for so-called point sources of pollution, as required by
25
sections 301 and 306 of the CWA, 33 U.S.C. §§ 1311, 1316.  Point source discharges are
26
regulated under National Pollutant Discharge Elimination System ("NPDES") permits, which

Western Environmental Law Center
1402 3rd Ave, Suite 1022
Seattle, WA 98101
206-487-7250

Earthrise Law Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR 97219
503-768-6929

1    must contain limitations "necessary to meet water quality standards."  33 U.S.C. §§
2    1311(b)(1)(C), 1342(a).

3        24.    Water quality standards also are used to establish measures to control nonpoint
4    source pollution.  Unlike point source pollution, nonpoint source pollution is generally considered
5    to be any pollution that cannot be traced to a single discrete conveyance.  Examples include
6    runoff from agricultural or forestry lands, on-site septic systems, and increased solar radiation
7    caused by the loss of riparian vegetation.

8        25.    Congress did not establish a federal permitting scheme for nonpoint sources of
9    pollution, such as pollution from timber harvesting and agricultural activities.  Instead, Congress
10   assigned states the task of implementing water quality standards for nonpoint sources, with
11   oversight, guidance, assistance, and funding from EPA.  *See, e.g.*, 33 U.S.C. §§ 1288, 1313, 1329.
12   Even so, water quality standards apply to all pollution sources, point and nonpoint alike.  "[S]tates
13   are required to set water quality standards for *all* waters within their boundaries regardless of the
14   sources of the pollution entering waters."  *Pronsolino v. Nastri*, 291 F.3d 1123, 1127 (9th Cir.
15   2002) (emphasis in original).

16   **Listing of Impaired Waters: Every Two Years the State Must Identify Waters that are Not
     Meeting the Water Quality Standards**
17

18       26.    Section 303(d)(2) of the CWA requires states to "submit to the Administrator
19   from time to time" a list of "waters identified and loads established under" subsections
20   303(d)(1)(A)–(D), including, among other components, a list of waters for which technology-
21   based effluent limitations "are not stringent enough to implement any water quality standard
22   applicable to such waters." 33 U.S.C. § 1313(d)(2); *see also* 40 C.F.R. §§ 130.7(b); 130.10(b),(d).

23       27.    Such waters are called "water quality limited" or "impaired" waters.  40 C.F.R. §
24   131.3(h) ("*Water quality limited segment* means any segment where it is known that water quality
25   does not meet applicable water quality standards, and/or is not expected to meet applicable water
26   quality standards." (emphasis in original)).

COMPLAINT                           7         Western Environmental Law Center        Earthrise Law Center
                                              1402 3rd Ave, Suite 1022               Lewis & Clark Law School
                                              Seattle, WA 98101                       10015 SW Terwilliger Blvd.
                                              206-487-7250                            Portland, OR 97219
                                                                                      503-768-6929

1    28.    EPA has promulgated rules that establish the frequency of such submissions,

2    consistent with the statute.  Every two years states must compile their list of impaired waters and

3    submit them to EPA for approval.  33 U.S.C. § 1313(d)(1)(A), (d)(2).  These lists are commonly

4    called "303(d) lists" in reference to section 303(d) of the CWA.

5    29.    The 303(d) lists serve several important functions, in addition to identifying

6    which waterbodies must receive the required TMDL clean-up plans.  The list provides the public

7    and local governments with specific information about the health of the waterbodies throughout

8    the state and identifies which waterbodies may not be safe to use.  It identifies where improved

9    nonpoint source controls of polluted runoff from land activities, such as farming and logging, are

10   needed, as well as priorities for habitat restoration.  Most important, a waterbody's inclusion on

11   the 303(d) list triggers additional protections under the CWA's NPDES permitting requirements

12   to ensure impaired waters are not further degraded and are cleaned up, consistent with the CWA's

13   prohibition on point sources' causing or contributing to violations of water quality standards.  *See*

14   40 C.F.R. §§ 122.4, 122.44.

15   30.    For purposes of listing impaired waters, the applicable water quality standards are

16   the same as those established pursuant to section 303(c) of the CWA, which include waters'

17   designated uses, numeric criteria, narrative criteria, and antidegradation requirements.  40 C.F.R.

18   § 130.7(b)(3).

19   31.    In order to identify water quality-limited segments, each state, at a minimum,

20   must "assemble and evaluate all existing and readily available water quality-related data and

21   information" for specific categories of waters that include, but are not limited to, "those for which

22   water quality problems have been reported by local, state, or federal agencies; members of the

23   public; or academic institutions.  These organizations and groups should be actively solicited for

24   research they may be conducting or reporting.  For example, university researchers, the United

25   States Department of Agriculture, the National Oceanic and Atmospheric Administration, the

26

COMPLAINT                    8      Western Environmental Law Center          Earthrise Law Center
                                     1402 3rd Ave, Suite 1022                  Lewis & Clark Law School
                                     Seattle, WA 98101                         10015 SW Terwilliger Blvd.
                                     206-487-7250                              Portland, OR 97219
                                                                               503-768-6929

1  United States Geological Survey, and the United States Fish and Wildlife Service are good

2  sources of field data . . . ."  40 C.F.R. § 130.7(b)(5), (b)(5)(iii).

3       32.      At a minimum, "all existing and readily available data and information" includes

4  data about "threatened" waters and "[w]aters for which dilution calculations or predictive models

5  indicate nonattainment of applicable water quality standards." *Id.* § (b)(5)(i)-(ii).

6       33.      EPA recommends that states place waterbody segments into "five unique

7  assessment categories."  EPA, Guidance for 2006 Assessment, Listing and Reporting

8  Requirements Pursuant to Sections 303(d), 305(b) and 314 of the Clean Water Act (July 29, 2005)

9  at 47.  These categories are:

10      (1)     Attaining the water quality standard and no use is threatened;

11      (2)     Attaining some of the designated uses; no use is threatened; and insufficient or no
12              data and information is available to determine if the remaining uses are attained or
                threatened;

13      (3)     Insufficient or no data and information to determine if any designated use is
14              attained;

15      (4)     Impaired or threatened for one or more designated uses but does not require the
                development of a TMDL because: (A) a TMDL has already been completed, (B)
16              other pollution controls are expected to result in the clean-up of the impairment,
                or (C) the impairment is not caused by a pollutant; and

17      (5)     The water quality standard is not attained because the segment is impaired or
18              threatened for one or more designated uses by a pollutant(s), and requires a
                TMDL.

19      34.      Waters placed in categories 4 and 5 comprise the state's 303(d) list of water

20  quality limited waters.

21      35.      For each listed waterbody, the state "shall identify the pollutants causing or

22  expected to cause violations of the applicable water quality standards." 40 C.F.R. § 130.7(b)(4).

23      36.      After creating its impaired waters list, a state "shall provide documentation to the

24  Regional Administrator to support" its decision to list or not to list waterbodies.  40 C.F.R §

25  130.7(b)(6).

26

COMPLAINT                    9

1    37.    "The Regional Administrator shall approve a list developed under § 130.7(b) . . .

2    only if it meets the requirements of § 130.7(b)."  40 C.F.R § 130.7(d)(2).

3    38.    A state must submit an updated impaired waters list to EPA on April 1 of every

4    even-numbered year.  40 C.F.R. § 130.7(d)(1).  States must submit their lists to EPA for approval

5    or disapproval.  33 U.S.C. § 1313(d)(2).  EPA must act on the list within 30 days and if it

6    disapproves the list, EPA must establish a replacement list within 30 days of the disapproval.  33

7    U.S.C. § 1313(d)(2).

8        **Total Maximum Daily Loads: The States Must Develop Clean-Up Plans to Ensure**
         **Pollution Levels in Impaired Waters are Reduced to Meet Water Quality Standards**
9

10   39.    For each of its 303(d)-listed impaired waters, a state must establish a "total

11   maximum daily load" ("TMDL") of pollutants "at a level necessary to implement the applicable

12   water quality standards[.]"  33 U.S.C. § 1313(d)(1)(C).  To encourage prompt state action even

13   where water quality data are imperfect, the Act requires that TMDLs include a "margin of safety

14   which takes into account any lack of knowledge concerning the relationship between effluent

15   limitations and water quality."  *Id*.

16   40.    A TMDL is the total daily loading of a pollutant for a particular waterbody or

17   waterbody segment.  *See* 40 C.F.R. §130.2(i).  The total amount of a pollutant that may enter a

18   waterbody while still meeting water quality standards is called its "loading capacity."  40 C.F.R. §

19   130.2(f). TMDLs for individual waterbodies or segments are typically bundled together by

20   watershed or subbasin in the same analytical document that is submitted to EPA for approval.

21   41.    After calculating a waterbody's loading capacity, a TMDL then distributes

22   portions of the total loading capacity to individual sources or categories of pollution sources.

23   These allocations include both "load allocations" and "wasteload allocations," for nonpoint and

24   point sources of pollution respectively.  40 C.F.R. § 130.2(i).  The purpose of load and wasteload

25   allocations is to allocate the total amount of pollution that may enter a waterbody between all the

26   sources of pollution, including both point and nonpoint sources, thereby restricting pollution

Western Environmental Law Center        Earthrise Law Center
1402 3rd Ave, Suite 1022                Lewis & Clark Law School
Seattle, WA 98101                       10015 SW Terwilliger Blvd.
206-487-7250                            Portland, OR 97219
                                        503-768-6929

1   inputs sufficiently to attain and maintain water quality standards.  Only if nonpoint source

2   controls provide the basis for more stringent load allocations can wasteload allocations for point

3   sources be made less stringent.  *Id.*

4         42.     As with water quality standards, a state must submit TMDLs to EPA for approval

5   or disapproval.  33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.2(d).  EPA must act on a TMDL

6   submission within 30 days, and if it disapproves the TMDL, EPA must establish a replacement

7   TMDL within 30 days of the disapproval.  33 U.S.C. § 1313(d)(2).

8         43.     Upon EPA approval or promulgation of a TMDL, all future NPDES permits must

9   be consistent with the TMDL's wasteload allocations for point sources.  40 C.F.R. §

10  122.44(d)(1)(vii)(B).  The approved load allocations serve as the basis for state and local

11  programs for controlling nonpoint source pollution, including state programs that receive federal

12  funds under section 319 of the CWA, 33 U.S.C. § 1329.  Once EPA approves a TMDL, the state

13  must also incorporate the TMDL into its "continuing planning process" under section 303(e) of

14  the CWA.  33 U.S.C. § 1313(e)(3)(C).

15        44.     Along with each new 303(d) list, a state must establish and submit to EPA a

16  "priority ranking" of its impaired waters, "taking into account the severity of the pollution and the

17  uses to be made of such waters."  33 U.S.C. § 1313(d)(1)(A).  This priority ranking must also

18  "specifically include the identification of waters targeted for TMDL development in the next two

19  years."  40 C.F.R. § 130.7(b)(4).

20        45.     States must prepare TMDLs "in accordance with the priority ranking."  40 C.F.R.

21  § 130.7(c)(1).  Federal regulations provide that "schedules for submissions of TMDLs shall be

22  determined by the [EPA] Regional Administrator and the State."  40 C.F.R. § 130.7(d)(1).

23                **Judicial Review under the Administrative Procedure Act**

24        46.     Section 702 of the Administrative Procedure Act ("APA") provides a private

25  cause of action to any person "suffering legal wrong because of agency action, or adversely

26  affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702.

COMPLAINT                    11        Western Environmental Law Center          Earthrise Law Center
                                       1402 3rd Ave, Suite 1022                   Lewis & Clark Law School
                                       Seattle, WA 98101                          10015 SW Terwilliger Blvd.
                                       206-487-7250                               Portland, OR 97219
                                                                                  503-768-6929

1    47.    Only final agency actions are reviewable under the APA.  5 U.S.C. § 704.

2 Agency action includes a "failure to act." *Id*. § 551(13).  Under the APA, a court must "hold

3 unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary,

4 capricious, an abuse of discretion, or otherwise not in accordance with law;" "in excess of

5 statutory jurisdiction, authority, or limitations, or short of statutory right;" or "without observance

6 of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D).

7                              **FACTUAL BACKGROUND**

8                       **Washington's Water Quality Standards**

9        *Designated Uses*

10    48.    Uses must be designated based on consideration of the use and value of a

11 waterbody for public water supplies, protection and propagation of fish, shellfish, and wildlife,

12 recreation, and agricultural, industrial, and other purposes.  40 C.F.R. § 131.10(a).

13    49.    Washington has established several categories of designated uses for fresh water,

14 such as "aquatic life uses, which include "all indigenous fish and nonfish aquatic species'

15 including but not limited to char (bull trout and Dolly Varden), salmonid (salmon and steelhead),

16 non-anadromous interior redband trout, and indigenous warm water species (dace, redside shiner,

17 chiselmouth, sucker, and northern pikeminnow); recreational uses (extraordinary primary contact

18 recreation, primary contact recreation, and secondary contact recreation); and water supply uses

19 (domestic, agricultural, industrial, and stock watering).  WAC 173-201A-200(1)-(3).  Fresh water

20 use designations are described, designated, and mapped at WAC 173-201A-600 and WAC 173-

21 201A-602.

22    50.    Washington's use designations for marine waters are by category—

23 "extraordinary," "excellent," "good," and "fair,"—and apply to salmonids and other fish species;

24 clam, oyster, and mussel, rearing and spawning; and crustaceans and other shellfish (crabs,

25 shrimp, crayfish, scallops, etc.).  *See* WAC 173-201A-210.  Use designations for Washington's

26

COMPLAINT                        12

1  marine surface waters are described and designated at WAC 173-201A-210, WAC 173-201A-
2  610, and WAC 173-201A-612.

3      ***Numeric and Narrative Criteria***

4      51.      Water quality criteria must be set at a level necessary to protect the designated
5  uses of a waterbody.  33 U.S.C.§§ 1313(c)(2), 1313(d)(4)(B); 40 C.F.R. Part 131, Subpart B.
6  Criteria "must be based on sound scientific rationale and must contain sufficient parameters or
7  constituents to protect the designated use."  40 C.F.R. § 131.11(a)(1).  The criteria must also be
8  set at the level necessary to protect the most sensitive use of a waterbody.  *Id.*

9      52.      Washington's water quality standards include numeric criteria for a wide range of
10  convention, toxic, and non-toxic pollutants for aquatic life uses.  These include, for example,
11  numeric criteria for temperature that establish maximum levels of temperature for specific life
12  cycle stages of cold-water species of salmon, steelhead, and bull trout (char), many of which are
13  listed as threatened or endangered pursuant to the Endangered Species Act, 16 U.S.C. § 1531 *et*
14  *seq*. *See* WAC 173-201A-200(1)(c), Table 200(1)(c).  The standards also include minimum
15  levels of dissolved oxygen for life cycle stages in fresh water.  *See* WAC 173-201A-200(1)(d),
16  Table 200(1)(d).  Numeric criteria for marine waters also include minimum levels of dissolved
17  oxygen.  *See* WAC 173-201A-210 (1)(d), Table 210(1)(d).

18      53.      The water quality standards include numeric criteria for the protection of human
19  health from fecal contamination measured as indicator bacteria for recreation, WAC 173-201A-
20  200(2)(b), Table 200(2)(b) (fresh water), and for shellfish harvesting, WAC 173-201A-210(2)(b)
21  (marine water).

22      54.      Numeric criteria to protect fresh water and marine aquatic uses and human health,
23  from consumption of water and organisms, from toxic substances—including metals, chemicals,
24  and pesticides—are established at WAC 173-201A-240(5), Table 240.

25      55.      States may also establish narrative water quality criteria "to supplement numerical
26  criteria."  40 C.F.R. § 131.11(b)(2).

COMPLAINT                   13      Western Environmental Law Center      Earthrise Law Center
                                    1402 3ʳᵈ Ave, Suite 1022              Lewis & Clark Law School
                                    Seattle, WA 98101                     10015 SW Terwilliger Blvd.
                                    206-487-7250                          Portland, OR 97219
                                                                          503-768-6929

56.     Washington has established two generally-applicable narrative criteria for fresh and marine waters.  WAC 173-201A-260(2).

57.     First, "[t]oxic, radioactive, or deleterious material concentrations must be below those which have the potential, either singularly or cumulatively, to adversely affect characteristic water uses, cause acute or chronic conditions to the most sensitive biota dependent upon those waters, or adversely affect public health." *Id*. 173-201A-260(2)(a).

58.     Second, "[a]esthetic values must not be impaired by the presence of materials or their effects, excluding those of natural origin, which offend the senses of sight, smell, touch, or taste . . . ." *Id*. 173-201A-260(2)(b).

59.     Washington's narrative criteria are essential to the protection of its waters.  For example, Washington does not have numeric criteria for the protection of rivers and streams from nutrient pollution, such as nitrogen and phosphorus.  Nutrient pollution, the clean-up of which is a stated priority of EPA's, causes extensive algal blooms that deplete dissolved oxygen, alter food webs, and can release toxins hazardous to people, pets, and wildlife.  Likewise, Washington does not have numeric criteria for pollutants such as pharmaceuticals and personal care products that are known to cause harm to species in Washington waters.  Washington has no numeric criteria for the protection of wildlife, such as marine and freshwater mammals and birds, relying instead solely on its narrative criteria and designated uses for their protection.

### *Antidegradation Policy and Implementation Methods*

60.     The third component of water quality standards, the antidegradation policy, stems from the CWA's mandate to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (emphasis added).  A state's antidegradation policy must assure that water quality that meets or exceeds water quality standards is maintained and that no further degradation is allowed for waters that do not meet water quality standards. States must also develop antidegradation policy implementation methods.  40 C.F.R. § 131.12.

COMPLAINT                    14      Western Environmental Law Center        Earthrise Law Center
                                     1402 3rd Ave, Suite 1022                 Lewis & Clark Law School
                                     Seattle, WA 98101                        10015 SW Terwilliger Blvd.
                                     206-487-7250                             Portland, OR 97219
                                                                              503-768-6929

1          61.     Washington's antidegradation policy seeks to "[r]estore and maintain the highest

2   possible quality of the surface waters of Washington."  WAC 173-201A-300(2)(a).  The policy

3   includes a so-called Tier 1 requirement that "[e]xisting and designated uses must be maintained

4   and protected.  No degradation may be allowed that would interfere with, or become injurious to,

5   existing or designated uses, except as provided for in this chapter."  WAC 173-201A-310(1).

6   Existing uses are defined as "those uses actually attained in fresh or marine waters on or after

7   November 28, 1975, whether or not they are designated uses."  WAC 173-201A-020; *see also* 40

8   C.F.R. § 131.3(e).  Washington's antidegradation policy calls for Ecology to "take appropriate

9   and definitive steps to bring the water quality back into compliance with the water quality

10  standards" for waters that do not meet assigned criteria or protect existing or designated uses.

11  WAC 173-201A-310(2).  A TMDL is an appropriate first step with which to bring a waterbody

12  into compliance with applicable standards.

13  **Washington's Methodology for Identifying Waters That Violate Water Quality Standards**

14         62.     Contrary to federal regulations that require a state's 303(d) list to be based on "all

15  existing and readily available water quality-related data and information," Washington's list is

16  based on a very limited definition of data and information.

17         63.     When developing its 303(d) list, Washington follows its Water Quality

18  Assessment Policy 1-11 ("Assessment Policy").  This policy document lays out both the process

19  for reviewing and revising the Washington waters for inclusion on the list of impaired waters, and

20  explains the data submittal process, and the data quality necessary for inclusion in the water

21  quality assessment.

22         64.     The Assessment Policy is based on and implements the state's Water Quality Data

23  Act ("WQDA"), RCW 90.48.570 through 90.48.590.  Under the WQDA, Ecology is required to

24  use only "credible data" when "[d]etermining whether any water of the state is to be placed on or

25  removed from any section 303(d) list."  RCW 90.48.580(2)(a).  "Credible data" is defined to

26  mean data that comply with the requirements of RCW 90.48.585.  *Id.* 90.48.575(1).  Such

COMPLAINT          15     Western Environmental Law Center     Earthrise Law Center
1402 3rd Ave, Suite 1022     Lewis & Clark Law School
Seattle, WA 98101     10015 SW Terwilliger Blvd.
206-487-7250     Portland, OR 97219
503-768-6929

requirements include ensuring that the "[a]ppropriate quality assurance and quality control procedures were followed and documented in collecting and analyzing water quality samples; "[t]he samples or measurements are representative of water quality conditions at the time the data was collected"; an "adequate number of samples" were taken, and; the [s]ampling and laboratory analysis conform to methods and protocols generally acceptable in the scientific community . . . ." *Id.* 90.48.585(1).

65.     The Assessment Policy, in turn, states that the assessment of which waterbody segments will be listed is "based on available data and information that meets the requirements of this policy," and lays out in detail the steps that must be taken and the information that must be provided, before Ecology may use data submitted by the public when conducting the assessment.

66.     In some instances, the Assessment Policy mirrors the WQDA.  For example, Ecology will only consider "data" that "include[s] verification of appropriate Quality Assurance/Quality Control (QA/QC) . . . in the assessment."

67.     In other instances, the Assessment Policy appears to include additional limitations that are not identified in, and that do not clearly follow from, the WQDA.  For example, Ecology has also excluded any data that were generated more than ten years before its "call for data" in which Ecology accepted data submitted by the public or governmental entities.

68.     Contrary to federal regulations that require a state's 303(d) list to be based on all applicable water quality standards including narrative criteria, Washington's list has only a very limited number of listings based on narrative criteria.  This is, in part, because it uses an overly restrictive definition of what it means to violate the state's narrative criteria.

69.     The Assessment Policy's methodology for designating a waterbody as water quality limited based on violating narrative standards relating to pollutants is limited to instances when "information regarding that waterbody segment includes" where "[d]ocumentation of environmental alteration related to deleterious chemical or physical alterations, such as nutrients or sediment deposition, is measured by indices of resource condition or resource characteristic or

Western Environmental Law Center
1402 3rd Ave, Suite 1022
Seattle, WA 98101
206-487-7250

Earthrise Law Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR 97219
503-768-6929

other appropriate measure" and "[d]ocumentation of impairment of an existing or designated use is related to the environmental alteration on the same waterbody segment or grid." The Assessment Policy states that these determinations may be made based on "narrative information" but does not address how such information can be used in compliance with the WQDA.

**Washington's 2010 List of Impaired Waters**

70.     On August 5, 2009, Ecology announced a "call for data" that was held open from August 5, 2009, to October 15, 2009. Ecology required that data provided by the public be submitted through its Environmental Information Management ("EIM") System.

71.     Ecology prepared a draft list of impaired waters using data it had collected and received during the public processes based on Washington's listing methodology. *See* Water Quality Program Policy 1-11 Chapter 1 (revised March 2011), *id*. Chapter 2 (Sept. 2006), *available at* https://ecology.wa.gov/DOE/files/3b/3bf2eaab-090b-49d1-8ff4-fd8c82960f7a.pdf (last accessed May 10, 2018). On June 16, 2011, Ecology opened a public comment period on a proposed draft list of water quality limited waters.

72.     On December 28, 2011, March 20, 2012, and again on June 8, 2012, Ecology provided its proposed list and additional information and materials to EPA.

73.     On December 21, 2012, EPA approved the 303(d) list, with its marine-only updates, as the "2010 303(d) list." Although Ecology had submitted the list as the "2012 303(d) list," EPA recommended "that Ecology adopt the same naming convention, for consistency with both EPA approval documents and federal court filings and rulings concerning EPA's approval of the 2010 list." EPA took no action on Ecology's failure to update its 303(d) list with new data and information pertaining to the status of fresh waters.

74.     EPA's approval action added 849 segments to Washington's 2010 303(d) list and removed 313 previously-listed segments from Category 5 to other categories.

75.     The Washington 2010 303(d) list represents the last time Ecology or EPA updated its list of impaired marine waters. The list is based on data obtained prior to October 15, 2009.

COMPLAINT                    17          Western Environmental Law Center        Earthrise Law Center
                                         1402 3rd Ave, Suite 1022                Lewis & Clark Law School
                                         Seattle, WA 98101                       10015 SW Terwilliger Blvd.
                                         206-487-7250                            Portland, OR 97219
                                                                                 503-768-6929

**Washington's 2012 List of Impaired Waters**

76.     On June 22, 2011, Ecology announced a "call for data" that was held open from June 22, 2011, to August 31, 2011.  Ecology required that data provided by the public be submitted through its EIM System.

77.     Ecology prepared a draft list of impaired waters using data it had collected and received during the public processes based on Washington's listing methodology.  *See* Water Quality Program Policy 1-11 Chapter 1 (revised July 2012), *available at* https://ecology.wa.gov/DOE/files/a6/a626f4a0-515d-4b65-9419-1440926aab48.pdf (last accessed May 10, 2018); *id*. Chapter 2 (Sept. 2006), *available at* https://ecology.wa.gov/DOE/files/3b/3bf2eaab-090b-49d1-8ff4-fd8c82960f7a.pdf (last accessed May 10, 2018).  On June 16, 2011, Ecology opened a public comment period on a proposed draft list of water quality limited waters.

78.     On September 28, 2015, Ecology submitted the initial documents in support of the 2012 303(d) List to EPA, and submitted additional materials on October 14, 2015; February 3, 2016; March 4, 16, 29, 2016; April 19, 2016; and June 3, 2016.

79.     On July 22, 2016, EPA approved the 303(d) list, with its freshwater-only updates, as the "2012 303(d) list, not as the 2014 list as Ecology had originally designated it, because the assessment includes data collected only through May 1, 2011."  When approving the 2012 List, EPA stated that it was "expressly taking no action at this time on the State's marine waters."

80.     EPA's approval action on Washington's 2012 List added 1,622 fresh water waterbody segments and removed 303 previously-listed water quality limited segments from Category 5 to other categories.

81.     Washington's 2012 list represents the last time Ecology or EPA updated the state's 303(d) list for impaired fresh waters.  The list is based on data collected prior to May 1, 2011.

COMPLAINT                                      18          Western Environmental Law Center
                                                          1402 3rd Ave, Suite 1022
                                                          Seattle, WA 98101
                                                          206-487-7250

                                                          Earthrise Law Center
                                                          Lewis & Clark Law School
                                                          10015 SW Terwilliger Blvd.
                                                          Portland, OR 97219
                                                          503-768-6929

1    82.    When approving the 2012 303(d) List, EPA noted that it was "understood that

2 Ecology would assess all of the waters of the State, both fresh and marine, for all future biennial

3 303(d) list reviews after the 2012 303(d) List was completed" and that it anticipated such new

4 assessment "will be submitted as a 2014/2016 list[.]"

5    83.    Ecology has not submitted an updated 303(d) list to EPA for approval since.

6    84.    Currently, Ecology's 303(d) List identifies 4,548 discrete water quality-limited

7 segments that require a TMDL.

8                    **Washington's Historic and Current Rate of TMDL Development**

9    85.    Washington's pace of TMDL development in the years following enactment of

10 the CWA in 1972 was essentially nonexistent, and so, in 1991, NWEA filed suit against the EPA

11 Administrator to compel him to fulfill his statutory obligations under the Act to ensure that

12 Washington's water quality assessment, impaired waters listing, and TMDL development were

13 consistent with the CWA's requirements. *Nw. Envtl. Advocates v. EPA*, No. C91-427 (W.D.

14 Wash., filed April 2, 1991). The case was settled with a consent decree in 1992. However, in

15 1994, the consent decree was dissolved and NWEA amended its complaint on November 15,

16 1994. The case was subsequently settled again in 1998 upon the execution of three documents:

17 (1) a consent decree; (2) a settlement agreement; and a (3) Memorandum of Agreement ("MOA")

18 between Ecology and EPA. Attachment A to both the settlement agreement and the MOA was a

19 15-year schedule for the development of TMDLs, dated October 29, 1997.

20    86.    In the MOA, Ecology committed to submit TMDLs equivalent to all the water

21 quality limited segments listed on the state's 1996 list during the 15-year period, a total of 1,566

22 TMDLs, to be completed by June 30, 2013. In the settlement agreement, EPA agreed that if

23 Ecology failed to complete all the TMDLs by the final deadline, EPA "will take all steps

24 necessary to ensure that TMDLs for all [water quality limited segments] on the 1996 Section

25 303(d) list are completed by June 30, 2013 . . . through establishment of TMDLs or approval of

26 the TMDLs submitted by the State." Settlement Agreement ¶ 6.

Western Environmental Law Center          Earthrise Law Center
1402 3rd Ave, Suite 1022                   Lewis & Clark Law School
Seattle, WA 98101                          10015 SW Terwilliger Blvd.
206-487-7250                               Portland, OR 97219
                                           503-768-6929

87.    The NWEA-EPA consent decree terminated of its own accord upon fulfillment of EPA's obligations thereunder, on or about January 6, 2003.

88.    The 1997 MOA terminated of its own accord on December 31, 2013.

89.    During the 15-year period of the prior TMDL schedule (1998-2013), Washington completed TMDLs at an average rate of about 58 TMDLs per year.  However, during the period between Washington's submittal of its 1996 303(d) List and submittal of its 2012 303(d) List to EPA, Washington added new waters to its 303(d) List at a pace of 222 per year.  In other words, Washington identifies impaired waters for which TMDLs are needed at a rate four times the pace at which it completes TMDLs for impaired waters.

90.    Washington's pace of TMDL preparation, submittal, and EPA approval since the termination of the MOA on June 30, 2013, has slowed dramatically.  During the first six State fiscal years following the end of the original TMDL schedule—that is, July 1, 2013, through June 30, 2019—Washington completed and submitted to EPA seven submissions including a total of 57 approvable TMDLs, an average rate of about 10 TMDLs per year. However, Washington has not submitted a single TMDL to EPA since December 18, 2015, a period of nearly four years.

91.    Upon information and belief, Washington completed and submitted zero TMDLs during 2016, 2017, 2018, and to date in 2019 to EPA.

92.    At Ecology's post-MOA pace of 10 TMDLs per year, it would take over 190 years to complete TMDLs for just currently-listed waters.

**Washington's 2012 303(d) List and Prioritization Schedule**

93.    On September 28, 2015, Ecology submitted to EPA what it described as "Washington State's 2014 Water Quality Assessment (WQA) and candidate 303(d) List" pursuant to CWA sections 305(b) and 303(d).

94.    Ecology's submittal contained what the agency described as a "Prioritization Schedule" for TMDL development pursuant to 40 C.F.R. § 130.7(b)(4).  The Prioritization

Western Environmental Law Center
1402 3rd Ave, Suite 1022
Seattle, WA 98101
206-487-7250

Earthrise Law Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR 97219
503-768-6929

1  Schedule referenced the 1997 MOA, asserting that the MOA "provides the schedule for

2  completion of TMDLs."

3       95.    Ecology's Prioritization Schedule includes no actual dates by which any particular

4  TMDL will be completed; no list of particular impaired waters for which Ecology will prioritize

5  the development of TMDL; and no list of "waters targeted for TMDL development within the

6  next two years" as required by 40 C.F.R. § 130.7(d)(1).  Instead, it describes a "Five Step, Five

7  Year" process by which Ecology's regional offices will purportedly "go through this schedule to

8  determine where they should focus new resources in future TMDL efforts."

9       96.    When it developed its Prioritization Schedule, Ecology did not "tak[e] into

10 account the severity of the pollution and the uses to be made of such waters" or water quality

11 management areas, as required by the CWA because the schedule is not a schedule and it contains

12 no priorities.  33 U.S.C. § 1313(d)(1)(A).

13      97.    For each year during the five-year period from 2016 to 2020, Ecology states in its

14 Prioritization Schedule that it will "begin the TMDL process by scoping" a particular set of

15 "water resource inventory areas."  "Scoping" means that Ecology will:

16          Identify and prioritize known and suspected water quality issues within the water quality
17          management area by assembling information from extensive community involvement and
            internal Ecology staff and reports, including the 303(d) list and the schedule for TMDL
18          production. Produce a Needs Assessment and develop a TMDL priority list.

19   Prioritization Schedule at 1.

20      98.    On June 22, 2016, EPA approved Ecology's 303(d) List and Prioritization

21 Schedule submitted on September 28, 2015, but approved it as Washington's 2012 303(d) List

22 (that is, not the "2014" list as identified by Ecology) because Ecology had included only water

23 quality assessment data collected through May 1, 2011.

24      99.    As part of its review of Washington's 303(d) List and Integrated Report, EPA

25 reviewed the State's "priority ranking" of listed waters, and expressly stated as follows:

26          The EPA concludes that the State properly took into account the severity of pollution and
            the uses to be made of such waters. The EPA reviewed the State's identification of [water
            quality limited segments] WQLS targeted for TMDL development in the next two years,

COMPLAINT                          21

Western Environmental Law Center          Earthrise Law Center
1402 3rd Ave, Suite 1022               Lewis & Clark Law School
Seattle, WA 98101                      10015 SW Terwilliger Blvd.
206-487-7250                           Portland, OR 97219
                                       503-768-6929

1   and concludes that the targeted waters are appropriate for TMDL development in this
    period.

2   EPA Approval, Enclosure at 9.

3   **FIRST CLAIM FOR RELIEF**

4   **Violation of the Administrative Procedure Act**

5   **(Approval of Washington's 2012 303(d) List)**

6      100.    Plaintiff realleges all preceding paragraphs.

7      101.    EPA's regulations mandate that a state "shall identify those water quality-limited

8   segments still requiring TMDLs within its boundaries for which [pollution control measures] are

9   not stringent enough to implement any water quality standards (WQS) applicable to such waters."

10  40 C.F.R. § 130.7(b)(1).  EPA's regulations further require a state to "assemble and evaluate all

11  existing and readily available water quality-related data and information . . . ."  40 C.F.R. §

12  130.7(b)(5).

13     102.    EPA's approval of Washington's 2012 303(d) List was arbitrary, capricious, an

14  abuse of discretion, or otherwise not in accordance with law, for at least the following reasons:

15     (A)    With the 2012 list Ecology failed to identify any marine waterbodies that are

16            water quality limited;

17     (B)    Ecology failed to identify the pollutants causing or expected to cause violations of

18            the applicable water quality standard for each listed waterbody, in violation of 40

19            CR 130.7(b)(4);

20     (C)    Ecology failed to gather and use all readily available water quality-related data

21            and information when developing the 2012 List, in violation of the requirements

22            under 40 C.F.R. § 130.7(b)(5);

23     (D)    Ecology failed to provide the required information and explanations required

24            under 40 C.F.R. § 130.7(b)(6) with its submission to EPA. Specifically, the state

25            must provide "[a] description of the methodology used to develop the list; [a]

26            description of the data and information used to identify waters, including a

COMPLAINT                    22     Western Environmental Law Center      Earthrise Law Center
                                    1402 3rd Ave, Suite 1022              Lewis & Clark Law School
                                    Seattle, WA 98101                     10015 SW Terwilliger Blvd.
                                    206-487-7250                          Portland, OR 97219
                                                                          503-768-6929

1    description of the data and information used by the State as required by §

2    130.7(b)(5); [a] rationale for any decision to not use any existing and readily

3    available data and information for any one of the categories of waters as described

4    in § 130.7(b)(5); and [a]ny other reasonable information requested by the

5    Regional Administrator."  40 C.F.R. § 130.7(b)(6)(i)-(iv).  On information and

6    belief, Ecology failed to provide this information to EPA, and;

7    (E)    EPA's regulations require that a state "shall identify those water quality-limited

8    segments still requiring TMDLs within its boundaries for which [pollution control

9    measures] are not stringent enough to implement any water quality standards

10   (WQS) applicable to such waters."  40 C.F.R. § 130.7(b)(1).  "For the purposes of

11   listing waters under §130.7(b), the term 'water quality standard applicable to such

12   waters' and 'applicable water quality standards' refer to those water quality

13   standards established under section 303 of the Act, including numeric criteria,

14   narrative criteria, waterbody uses, and antidegradation requirements."  40 C.F.R.

15   § 130.7(3). Ecology failed to identify water quality-limited segments with the

16   state, that still require TMDLs, where the current pollution control mechanism are

17   not stringent enough to implement the applicable 1) designated uses, 2) numeric

18   water quality criteria, 3) narrative water quality criteria, and/or 4) antidegradation

19   requirements.

20   103.    EPA "shall approve [a 303(d) list] . . . only if it meets the requirements of

21   130.7(b)."  40 C.F.R. § 130.7(d)(2).  Thus, EPA's approval of Washington's 2012 303(d) List was

22   arbitrary, capricious and not in accordance with 16 U.S.C. § 1313(d) and 40 C.F.R. § 130.7(d).

23   104.    Plaintiffs therefore seek relief from EPA's arbitrary, capricious, and illegal action

24   under 5 U.S.C. § 706(2)(A).

25   /// /// ///

26   /// /// ///

COMPLAINT                        23    Western Environmental Law Center          Earthrise Law Center
                                       1402 3rd Ave, Suite 1022                  Lewis & Clark Law School
                                       Seattle, WA 98101                         10015 SW Terwilliger Blvd.
                                       206-487-7250                              Portland, OR 97219
                                                                                 503-768-6929

**SECOND CLAIM FOR RELIEF**

**Violation of Administrative Procedure Act**

**(EPA Failure to Identify the Water Quality-Limited Waters in Washington and Establish TMDLs for Such Waters)**

105.    Plaintiff realleges all preceding paragraphs.

106.    After a state submits its list of impaired waters, EPA "shall either approve or disapprove such listing . . . not later than 30 days after the date of submission." 40 C.F.R. § 130.7(d)(2).  Under its own CWA regulations, EPA "shall approve [a 303(d) list] . . . only if it meets the requirements of 130.7(b)." 40 C.F.R. § 130.7(d)(2).  Thus, where a state has failed to comply with the requirements of 40 C.F.R. § 130.7(b), EPA is required to disapprove the list.

107.    When EPA disapproves a 303(d) list, it "shall, not later than 30 days after the date of such disapproval, identify such waters in such State and establish such loads for such waters as determined necessary to implement applicable WQS." 40 C.F.R. § 130.7(d)(2).  Once the list is prepared, the "Regional Administrator shall promptly issue a public notice seeking comment on such listing and loadings." *Id.*  Based on the comments received, the Regional Administrator must "making any revisions he deems appropriate" and "shall transmit the listing and loads to the State." *Id.*

108.    Ecology failed to comply with the requirements of 40 C.F.R. § 130.7(b) when developing and submitting to EPA its 2012 list.  As a result, EPA was required to disapprove the list and establish the list of impaired waters in Washington, take public comment on its proposed list, and send a final list to Washington.  40 C.F.R. § 130.7(d)(2). EPA failed to do so.

109.    EPA's inaction is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Plaintiffs therefore seek relief from EPA's arbitrary, capricious, and illegal action under 5 U.S.C. § 706(2)(A).

/// /// ///

/// /// ///

/// /// ///

COMPLAINT                                    24

Western Environmental Law Center
1402 3rd Ave, Suite 1022
Seattle, WA 98101
206-487-7250

Earthrise Law Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR 97219
503-768-6929

1

2

**THIRD CLAIM FOR RELIEF**

**Violation of the Clean Water Act**

3

**(EPA Failure to Identify the Water Quality-Limited Waters in Washington and Establish TMDLs for Such Waters)**

4

110.    Plaintiff realleges all preceding paragraphs.

5

111.    After a state submits its list of impaired waters, EPA "shall either approve or

6

disapprove such listing . . . not later than 30 days after the date of submission.  40 C.F.R. §

7

130.7(d)(2).  Under its own CWA regulations, EPA "shall approve [a 303(d) list] . . . only if it

8

meets the requirements of 130.7(b)."  40 C.F.R. § 130.7(d)(2).  Thus, where a state has failed to

9

comply with the requirements of 40 C.F.R. § 130.7(b), EPA is required to disapprove the list.

10

112.    When EPA disapproves of a listing, it "shall, not later than 30 days after the date

11

of such disapproval, identify such waters in such State and establish such loads for such waters as

12

determined necessary to implement applicable WQS."  40 C.F.R. § 130.7(d)(2).  Once the list is

13

prepared, the "Regional Administrator shall promptly issue a public notice seeking comment on

14

such listing and loadings."  *Id*.  Based on the comments received, the Regional Administrator

15

must "making any revisions he deems appropriate" and "shall transmit the listing and loads to the

16

State."

17

113.    Ecology failed to submit any list of impaired waters, as required by CWA §

18

303(d) and 40 C.F.R. § 130.7(b)(1)-(2) and (d)(1), for the years 2014, 2016, and 2018. As a result,

19

Ecology has constructively submitted inadequate 303(d) lists in each of those years.

20

114.    Ecology also failed to submit a two-year TMDL schedule, priority ranking and

21

TMDL Prioritization Schedule, as required by 40 C.F.R. 130.7(b)(4) and (d)(1)-(2), for the years

22

2014, 2016, and 2018. As a result, Ecology has constructively submitted inadequate two-year

23

TMDL schedules, priority rankings, and TMDL Prioritization Schedules in each of those years.

24

115.    Those constructive submissions triggered EPA's and the Regional

25

Administrator's nondiscretionary duty to disapprove those constructively submitted 303(d) lists,

26

two-year TMDL schedules, priority rankings, and TMDL Prioritization Schedules, and then to

Western Environmental Law Center
1402 3rd Ave, Suite 1022
Seattle, WA 98101
206-487-7250

Earthrise Law Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR 97219
503-768-6929

"identify such [impaired] waters . . . and establish [TMDLs] for such waters as determined necessary to implement applicable WQS" within 30 days of the disapproval, as required by CWA § 303(d) and 40 C.F.R. § 130.7(d)(2). EPA failed to take that nondiscretionary action.

116.    The Administrator's failure to perform the nondiscretionary duties described above are subject to judicial review under 33 U.S.C. § 1365(a)(2).

## FOURTH CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act

**(EPA Failure to Identify the Water Quality-Limited Waters in Washington and Establish TMDLs for Such Waters)**

117.    Plaintiff realleges all preceding paragraphs.

118.    After a state submits its list of impaired waters, EPA "shall either approve or disapprove such listing . . . not later than 30 days after the date of submission. 40 C.F.R. § 130.7(d)(2). Under its own CWA regulations, EPA "shall approve [a 303(d) list] … only if it meets the requirements of 130.7(b)." 40 C.F.R. § 130.7(d)(2). Thus, where a state has failed to comply with the requirements of 40 C.F.R. § 130.7(b), EPA is required to disapprove the list.

119.    When EPA disapproves of a listing, it "shall, not later than 30 days after the date of such disapproval, identify such waters in such State and establish such loads for such waters as determined necessary to implement applicable WQS." 40 C.F.R. § 130.7(d)(2). Once the list is prepared, the "Regional Administrator shall promptly issue a public notice seeking comment on such listing and loadings." *Id.* Based on the comments received, the Regional Administrator must "making any revisions he deems appropriate" and "shall transmit the listing and loads to the State."

120.    Ecology has failed to submit lists of impaired waters, in compliance with 40 C.F.R. § 130.7, in 2014, 2016, and 2018 by failing to submit any list to EPA. As a result, Ecology has constructively submitted inadequate lists each of those years. As a result, EPA was

COMPLAINT                              26

1  required to disapprove those submissions and follow the procedures established in 40 C.F.R. §

2  130.7(d)(2).  EPA has failed to do so.

3          121.    Ecology has failed to submit a two-year TMDL schedule, priority ranking, and

4  Prioritization Schedule with its lists of impaired waters, as required by 40 C.F.R. 130.7(b)(4) and

5  (d)(1)-(2), in 2014, 2016, and 2018.  As a result, Ecology has constructively submitted inadequate

6  two-year TMDL schedules priority rankings, and Prioritization Schedules in each of those years.

7          122.    EPA's inaction and failure to determine a reasonable schedule for Washington's

8  development of TMDLs is arbitrary, capricious, an abuse of discretion, or otherwise not in

9  accordance with law.  Plaintiffs therefore seek relief from EPA's arbitrary, capricious, and illegal

10  action under 5 U.S.C. § 706(2)(A)

**FIFTH CLAIM FOR RELIEF**

**Violation of the Administrative Procedure Act**

**(Approval of Washington's 2012 Priority Ranking and Prioritization Schedule)**

14          123.    Plaintiff realleges all preceding paragraphs.

15          124.    EPA's approval of Washington's priority ranking and Prioritization Schedule,

16  submitted by the State along with its 2012 303(d) List, was arbitrary, capricious, an abuse of

17  discretion, or otherwise not in accordance with law for at least the following reasons:

18          (A)    Washington did not "tak[e] into account the severity of the pollution and the uses

19                  to be made of such waters" when developing its priority ranking and Prioritization

20                  Schedule, and as required by 33 U.S.C. § 1313(d)(1)(A).

21          (B)    Washington did not "specifically include the identification of waters targeted for

22                  TMDL development in the next two years" as required by 40 C.F.R. §

23                  130.7(b)(4).

24          (C)    Washington and the Regional Administrator of EPA have not determined

25                  Washington's schedule for the submission of TMDLs, as required by 40 C.F.R. §

26                  130.7(d)(1).

Western Environmental Law Center
1402 3rd Ave, Suite 1022
Seattle, WA 98101
206-487-7250

Earthrise Law Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR 97219
503-768-6929

125.    EPA's failure to develop a reasonable schedule for the completion of all remaining TMDLs needed in the State of Washington that is consistent with CWA requirements is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

126.    Plaintiffs therefore seek relief from EPA's arbitrary, capricious, and illegal action under 5 U.S.C. § 706(2)(A).

**REQUEST FOR RELIEF**

WHEREFORE, plaintiff Northwest Environmental Advocates respectfully requests that this Court:

A.    Declare that EPA violated the CWA and acted in a manner that is arbitrary, capricious, or otherwise not in accordance with law when it unlawfully approved Washington's 2012 list of impaired waters under section 303(d) of the Clean Water Act;

B.    Set aside, vacate, and remand EPA's approval of Washington's 2012 303(d) List;

C.    Order EPA to disapprove Washington's 2012 List of impaired waters and identify the impaired waters in the state within 30 days of the disapproval, as required by Section 303(d) of the Clean Water Act;

D.    Declare that EPA violated the CWA and acted in a manner that is arbitrary, capricious, or otherwise not in accordance with law by failing to identify the impaired waters in Washington and establishing the protective loads for such waters in light of Ecology's failure to provide approvable lists under Section 303(d) of the Clean Water Act in 2014, 2016, and 2018;

E.    Set aside, vacate, and remand EPA's approval of Washington's 2012 TMDL Prioritization Schedule, priority ranking, and two-year schedule for the development of TMDLs;

F.    Order EPA to develop a schedule for the completion of all remaining TMDLs needed in the State of Washington that is consistent with the CWA's objectives;

G.    Award NWEA its reasonable costs and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 and the CWA, 16 U.S.C. § 1365; and

H.    Grant such other relief as the Court deems just and proper.

COMPLAINT                          28

Western Environmental Law Center
1402 3rd Ave, Suite 1022
Seattle, WA 98101
206-487-7250

Earthrise Law Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR 97219
503-768-6929

DATED this 26th day of September 2019.

Respectfully submitted,


*s/ Andrew Hawley*
Andrew Hawley (WSBA # 53052)
Western Environmental Law Center
1402 3rd Ave., Suite 1022
Seattle, WA 98101
(206) 487-7250
hawley@westernlaw.org

James N. Saul (OSB #1067236)
(*Pro hac vice forthcoming*)
Earthrise Law Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR 97219
(503) 768-6929
jsaul@lclark.edu

*Attorneys for Plaintiff Northwest
Environmental Advocates*

COMPLAINT          29          Western Environmental Law Center          Earthrise Law Center
                                1402 3rd Ave, Suite 1022                 Lewis & Clark Law School
                                Seattle, WA 98101                        10015 SW Terwilliger Blvd.
                                206-487-7250                             Portland, OR 97219
                                                                         503-768-6929